IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

| | |
|---|---|
| **WILLIAM ZIEGLER and VICKI ZIEGLER,**<br><br>Plaintiffs,<br><br>v.<br><br>**POLARIS INDUSTRIES, INC. and ERIC KIPP,**<br><br>Defendants. | **CASE NO. 1:21-CV-00956**<br><br>**HON. JANE M. BECKERING**<br><br>**MAGISTRATE JUDGE SALLY J. BERENS** |

**<u>PLAINTIFF WILLIAM ZIEGLER and VICKI ZIEGLER'S MOTION TO ADJUST RULE 26 SCHEDULE AS CONCERNS LIABILITY WITNESSES</u>**

Now comes the Plaintiffs, William and Vicki Ziegler, by and through their attorney in this regard, Thomas M. Paris, and for their Motion to Adjust Rule 26 Schedule as Concerns Liability Witnesses, states as follows:

**INTRODUCTION**

No one disputes that William Ziegler has suffered catastrophic life-altering injuries, nor that his faithful wife, Vicki Ziegler, has incurred significant damages. Well ahead of schedule, Plaintiffs' counsel has, or will, produce reports of a life care planner, physician, and economist which the Plaintiff will rely upon at trial. Expert testimony on issues related to liability; a far more complicated task - - and dependent on testimony and documents not as readily available.

In an effort to fully understand why the passenger side A-pillar collapsed on Plaintiff, his counsel reviewed thousands of pages of deposition in lawsuits claiming an inadequacy, even fraud, concerning the Polaris' rollover protection system (ROPS). Additionally, engineers, accident reconstructionists, and physicians have been consulted to present the fullest explanation

1

of why a former three-sport athlete, village trustee, productive working citizen who was actively involved in every way with his wife and children will never again live beyond a wheelchair.

Given the magnitude of damages, Plaintiff intends to build upon the work begun in lawsuits alleging Polaris defrauded customers by selling a ROPS that was less than promised. Plaintiff has been diligent in discovering unknown facts and developing theories of liability. On February 21, 2022, Plaintiff issued initial discovery to Polaris. Many supplemental requests followed and are explained below. Plaintiffs' counsel formally retained liability consultants in June of 2022. On October 4, 2022, Plaintiff issued 30(b)(6) depositions to Polaris for ten categories of witnesses. Only two have been completed. Plaintiff's' counsel has committed to never before attempted analysis that cannot be completed under the current schedule. The extension requested only deals with witnesses who will discuss the unreasonably dangerous ROPS. Plaintiff has, and will, produce pursuant to the current schedule Rule 26 reports and depositions of damage witnesses.

## SIMILAR POLARIS LITIGATION ALLEGING ROPS INADEQUACIES

Before and since filing suit, Plaintiffs' counsel searched public records for similar lawsuits. Among the cases discovered, a trilogy of cases against Polaris alleging the ROPS is not what it claims to be. A similar/identical lawsuit was brought against Honda. In these lawsuits, individuals brought class action lawsuits alleging that utilitarian terrain vehicles (UTVs) display a label representing that the ROPS complies with OSHA 29 CFR §1928.53, but fails to meet that standard.[1] Plaintiffs allege that, contrary to Polaris' label, the testing practices do not comply with

---

[1] In the early 1970's OSHA was concerned about injury and death occurring to workers involved in rollover incidents while using agricultural tractors. In 2009, Polaris, as well as other manufacturers, joined forces to establish the Recreational Off Road Vehicle Association (ROHVA) to deter pending Consumer production Safety Commission (CPSC) rules - - a legally permissible action. ROHVA adopted the OSHA tractor standard. It required all its members' vehicles to meet the tractor standard and post a label on the vehicle certifying as much.

OSHA's requirement. Class Plaintiffs allege that if the sticker advising purchasers explained that the ROPS failed to meet OSHA requirements, they would not have purchased the UTVs. The claims assert fraud and misrepresentation and seek damages equal to the cost of replacing the ROPS with one that will satisfy the OSHA standard.

Some background is in order to understand why this misrepresentation matters to this case. OHSA section 1928.53 requires that, when testing an agricultural tractor's ROPS, the manufacturer use the vehicle's weight as a variable in the calculation as to how strong the ROPS must be. "Weight" is defined at 29CFR§1928.51(a) as:

> Tractor Weight includes the protective frame or enclosure, all fuels, and other components required for normal use of the tractor. Ballast shall be added as necessary to achieve a minimum total weight of 110 pounds per maximum power takeover horsepower at the rated engine speed or the maximum gross vehicle weight specified by the manufacturer, whichever is the greatest….<u>In case power take-off horsepower is not available, 95% of net engine flywheel horsepower shall be used</u>.  (Emphasis added.)

Polaris, along with perhaps the entire off-road industry, uses gross vehicle weight notwithstanding UTVs do not have a Power Take-Off (PTO)[2] and look and act nothing like a tractor.

In these suits, Plaintiffs contend that Polaris, Honda, and perhaps others, use the wrong weight. The competing interpretation of the standard deals with whether the last sentence regarding flywheel horsepower applies to situations where the vehicle in question lacks a PTO. The difference in the strength of the ROPS, depending upon which weight one uses in the calculation can, and here does, result in dramatic differences in required ROPS strength.

---

[2] Power take-off (PTO) is a device that transfer an engines mechanical power to another piece of equipment. A PTO allows the hosting energy source to transmit power to additional equipment (such as farm implements) that do not have their own engine or power source. Alternatively stated, the PTO is a means of transferring mechanical power between the tractor's engine and implements.

Reviewing documents within the public records and consulting with aligned Plaintiffs' counsel seemed like an excellent place to locate consulting and testifying experts. Unfortunately, the confidentiality orders which Polaris' counsel insists upon make it nearly impossible for lawyers to discuss or share facts, documents, or experts. Publicly filed briefs and motions are heavily redacted or sealed. After many unsuccessful attempts to speak with lawyers who represent class action Plaintiffs, Plaintiffs' counsel moved on to retain knowledgeable non-testifying consultants to inform and guide the liability aspects of this matter. Attached hereto and incorporated herein by reference is a June 30, 2022, 20-page report[3] outlining pertinent facts of the subject crash, ROPS failure, and ROPS standards. Regarding Polaris' calculation of the ROPS strength Plaintiffs' counsel was advised as follows:

> Calculating ("W") [weight] using 95% of the net engine flywheel horsepower (44 hp) results in a "W" of 4,598 pounds, which is clearly greater than the GVW of 2,580 pounds, and therefore, following the prescribed formula, it should have been used as the weight to determine the strength requirements based on the standard.
>
> $$W = 110 \times 0.95 (44) = 4{,}598 \text{ lbs.}$$
>
> A comparison of loading that the ROPS would be required to meet using "W" equaling the GVW (2,850 pounds) vs. "W" using horsepower calculations (4,598 pounds) shows that using the higher weight would have required a ROPS that would have to withstand almost 40% more energy in the sideloading test and approximately 60% more energy in the rear loading test. Because Polaris chose to use the "W" as the GVW on the subject vehicle, the ROPS is much weaker than it should be.

While dramatic and damning (who would sell an off-road vehicle that would provide occupants 40-60% less strength than the minimum required), this calculation does not explain how the crash occurred, how much force it took to crush the A-pillar in on William Ziegler, whether

---

[3] Plaintiff has redacted information which would identify the non-testifying consultant. Plaintiff will not be identifying this consultant as a testifying expert and does not waive any privilege attaching to the report.

Polars ever even tested the A-pillar or considered alternative designs/strengths. Plaintiffs'' counsel has continuously sought explanation to those questions and more.

**Discovery Accomplished to Date.**

The brief history of relevant discovery as pertains to understanding Plaintiffs' diligence in discovering their case include the following:

- April 2022. Counsel for all parties travel to North Carolina to meet with first responders who show the location in the creek where the vehicle came to rest. Plaintiffs' surveyor and Kipp's accident reconstructionist document the previously unknown crash scene.[4]
- Summer 2022. Following settlement with Kipp (May), Plaintiff and Polaris make two more trips to North Carolina for depositions, Plaintiffs are deposed (August) and months' worth of litigation over Kipp's medical records begins. Subpoenas for every adult in the Kipp household on Thanksgiving Eve are served and ultimately held in abeyance.
- September 2022. Understanding through heavily redacted and sealed public records that the strength of Polaris' (and others) ROPS was the subject of intense litigation which Polaris has not disclosed in this litigation, Plaintiff issues a subpoena to class counsel and a supplemental request to produce to Polaris for the following documents:

  - Any document produced by Polaris in the matter of *Piva v. Polaris,* 37-2013-00041883-CU-PL-NC, a matter pending in the Superior Court of the State of California for the County of San Diego, North County.
  - Any deposition of any Polaris employee or expert in the matter of *Piva v. Polaris,* 37-2013-00041883-CU-PL-NC.
  - The deposition of any expert, or opinion witness, as well as their report and all exhibits to the deposition in the matter of *Piva v. Polaris,* 37-2013-00041883-CU-PL-NC.

---

[4] On April 7, 2022, a team of first responders escorted counsels for the parties to the crash site and explained what they saw and knew once they arrived. The fire chief even put on rubber boots, entered the creek and showed counsel where he saw the vehicle upon his arrival. He further explained that the tow truck/wrecker twice dropped the vehicle into the creek causing substantial damage that was not present during the crash. He then pulled out his cellphone and showed those present pictures he took that night which have been used during numerous depositions. But for this meeting, and the high level of cooperation between counsel, the considerable progress which has been made to understand the facts in this case would have not taken place, or if it had, would have required many more trips to North Carolina, additional lawyers and perhaps an even less complete narrative than is presently known.

- Any report issued by a Polaris witness or employee in the matter of *Piva v. Polaris,* 37-2013-00041883-CU-PL-NC.
- Any report issued by a Polaris witness or employee in the matter of *Hellman v. Polaris,* 2:21-CV-00949-JAM-OMC, a matter pending in the United States District Court, Eastern Division of California, Sacramento Division.
- Any deposition of any Polaris employee or expert in the matter of *Hellman v. Polaris,* 2:21-CV-00949-JAM-OMC.
- The deposition of any expert, or opinion witness, as well as their report and all exhibits to the deposition in the matter of *Hellman v. Polaris,* 2:21-CV-00949-JAM-OMC.
- Any document produced by Polaris in the matter of *Hellman v. Polaris*, 2:21-CV-00949-JAM-OMC.
- Any document produced by Polaris in the matter of *Guzman v. Polaris,* 8:19-cv-01543-FLA-KES.
- Any deposition of any Polaris employee or expert in the matter of *Guzman v. Polaris,* 8:19-cv-01543-FLA-KES.
- The deposition of any expert, or opinion witness, as well as their report and all exhibits to the deposition in the matter of *Guzman v. Polaris,* 8:19-cv-01543-FLA-KES.
- Any report issued by Polaris witness or employee in the matter of *Guzman v. Polaris,* 8:19-cv-01543-FLA-KES.
- Any document produced by Polaris, or from a witness pursuant to a subpoena, which discusses whether the ROPS Polaris installed on any of its vehicles actually complies with OSHA 1928.51, including the method of testing.
- Complete, unredacted copies of Plaintiffs' Motion to Certify the Class and Polaris' Motion for Summary Judgment including supporting briefs and opposing briefs with unredacted exhibits.

Polar indicates it will move to quash subpoena in California, but comply/object to request to produce on September 27, 2022.

Plaintiff agrees to proceed with supplement request to produce rather than waste time fighting in California and expanding the litigation from coast to coast.

- November 2022. On November 5, 2022, Polaris provides Plaintiff with some of the requested documents, primarily deposition transcripts without marked exhibits. Plaintiffs' counsel reviews the same and insists on having the exhibits. Kipp's Motion to Quash and Plaintiffs' Motion to Transfer are denied. Select portions of Kipp's medical records released on November 28, 2022.
- December 2022. On December 2, 2022, Polaris provides Plaintiffs' counsel with additional documents responsive to the supplemental request to produce. On December 23, 2022, Polaris responds to Plaintiffs' 30(b)(6) notice with three pages of objections. The parties endeavor to set Kipp's deposition, giving deference to 1) his recent heart attack, 2) his new counsel, and 3) his intention to assert Fifth

6

- Amendment and medical privilege (though no mention that the privilege would also be asserted as to driving facts).
- January 2023. Eric Kipp's deposition goes forward on January 31, 2023 and his wife's on February 1, 2023. Kipp's assertion of the Firth during his deposition covers not only "consumption of intoxicating substances leading up to or including the accident date in question, and whether he was impaired in his opinion of the subject vehicle", as previously advised, but all of his driving on the night of the crash. William Ziegler's limited memory of the crash, Eric Kipp's refusal to explain the crash and Dusty Hoyle's failure to appear for two scheduled depositions leaves Plaintiff, who carries the burden of proof to show how/why/where the ROPS collapsed, and its connection to his injury in need of additional methods/evidence to bolster his theory of liability.

On October 4, 2022, Plaintiffs' counsel issued a 30(b)(6) Notice of Deposition to Polaris for the following categories:

   A. Alternative designs or strength for ROPS considered by Polaris.
   B. Why the ROPS crushed in on Plaintiff, William Ziegler.
   C. The cost Polaris paid for the ROPS.
   D. The cost of any alternative design of a ROPS.
   E. Polaris' involvement with ROHVA in establishing ROHVA standards for ROPS.
   F. Polaris' involvement interacting with the United States Consumer Product Safety Commission as it considered ROPS for off-road vehicles.
   G. Any effort Polaris made to discourage the CPSC from regulating off-road vehicles including UTVs.
   H. Consumer expectation of a UTV ROPS.
   I. The cost and utility of a ROPS on a UTV.

Polaris objected in writing on December 23, 2022. The deposition of a Polaris witness was scheduled for February 10, 2023, however, the untimely death of a dear friend of Plaintiffs' counsel required that deposition to be postponed. The first 30(b)(6) depositions therefore took place on February 17, 2023 in Minnesota. Polaris indicates that it is not able to produce other witnesses until March 20, 2023, the day Plaintiffs' Rule 26 Disclosures are due.

**Delays in procuring fact witness testimony, and the importance of that testimony to liability experts are not attributable to Plaintiff.**

Plaintiffs' counsel issued a subpoena for Eric Kipp's deposition in May of 2022. However, in deference to Polaris and Kipp, Plaintiff did not proceed on that subpoena while Polaris' motion

7

and Kipp's objections regarding his medical records were before the North Carolina court. Kipp's counsel (now representing a former Defendant) insisted Mr. Kipp would only be deposed once. At all times Plaintiffs' counsel was ready, willing and able to travel to a location near Eric Kipp and depose him. Delays not attributable to Plaintiffs' counsel, including Eric Kipp's lawyer leaving the firm and a new lawyer needing to come up to speed, as well as representation for Nina Kipp (Eric's wife) delayed the Kipp depositions until January 31st and February 1st 2023.

The impact of Eric Kipp's testimony, including whether and how experts (and jurors) would rely upon it cannot be minimized. William Ziegler's memory of the events leading up to the crash, and the crash itself are limited. There are no other witnesses who can precisely explain how the crash occurred. The first post-occurrence witness, Dusty Hoyle, though under subpoena, has twice failed to appear for a deposition in North Carolina. Furthermore, the subject Ranger was disposed of by Kipp in the months following the crash and cannot be located. Hence, it would be all the more important to any accident reconstructionist or liability witness to hear from Mr. Kipp, or know that other evidence would have to fill in that gap.

Regarding the diligence of both Plaintiffs' and Polaris' counsel, after Mr. Hoyle did not show up for his first scheduled deposition, counsels went to Mr. Hoyle's home. There, they had a brief conversation from a distance; Mr. Hoyle seated inside of his house, counsel on the outside. Based upon his statements at that time, and the statements of first responders, it would appear that he, or his son, heard the crash from their home which is at least several hundred yards from the crash site. Plaintiffs' counsel believes Mr. Hoyle proceeded to the creek where the UTV was on its passenger's side. He tipped the vehicle back upright and extricated a paralyzed William Ziegler from the UTV. Mr. Ziegler was completely immobile as Mr. Hoyle held on to him as the frigid waters of Dark Ridge Creek swiftly passed.

Mr. Hoyle's testimony is important both on liability and damages. Plaintiffs' counsel has no reason to believe that Polaris will concede that the collapsed ROPS caused Mr. Ziegler's quadriplegia. Likewise, there are gaps and some inconsistencies in the testimony of the first responders and others as to where the UTV ended up, and how it may have ended up there. (By way of example, the North Carolina trooper who investigated the crash testified it was 15 degrees and dry. Paramedics claims it was raining. This contradiction and the vehicle leaving the roadway may be significant as black ice may be an issue.) It is believed that Mr. Hoyle's testimony will fill in some of these gaps and strengthen the parties (and their experts) understanding of how and where the crash occurred. Eric Kipp's January 31, 2023 unwillingness to testify as to the facts of the crash make Dustin Hoyle's testimony all the more important. It may provide information that liability experts will have to account for in establish reliable opinions.

**REQUIRING PLAINTIFFS' COUNSEL TO REVEAL EXPERT OPINIONS WITHOUT THE FULL BENEFIT OF POLARIS' 30(b)(6) TESTIMONY, DUSTIN HOYLE'S TESTIMONY, AND THE ANALYSIS OF POLARIS' RECENTLY PRODUCED CAD FILES WOULD REQUIRE PLAINTIFF TO REVEAL OPINIONS WITH INCOMPLETE INFORMATION AND NOT BRING FORWARD THE STRONGEST CASE POSSIBLE.**

William Ziegler is a quadriplegic. Past and future medical bills exceed $6 million. Future lost income amounts to a similar number. The damages for a 40 year old husband and father of two are even more significant. In due course, Plaintiff believes that Minnesota law will apply to this case as every decision made by Polaris regarding the ROPS design was made in the state of Minnesota. Minnesota law does not have damage caps. Michigan's connection to the crash is fortuitous. (Eric Kipp moved from North Carolina to Michigan about six months after the crash.)

Plaintiffs' counsel has retained, paid, or consulted with no less than seven knowledgeable liability consultants on how to best prove up the liability aspects of the case. In summary,

9

Plaintiffs' counsel has considered with knowledgeable experts four distinct theories as facts, or the lack thereof, have become known.

1. Plaintiffs' counsel will have no difficulty demonstrating that the ROPS is inadequate by the standards which Polaris claims to be following. As noted on Pages 8-9 of Exhibit A, portions of the ROPS is 60-40% less strong that it should be. The front A-pillar, however, is not part of the OSHA test. Plaintiff does not know if anyone at Polaris can testify as to its strength. None of the thousands of pages of depositions and documents reveal that Polaris tested the strength of the ROPS in a frontward rollover. 30(b)(6) scheduled for March 20, 2023, will reveal this one way or another.

   Plaintiffs' counsel and his consultants are on solid ground in calculating the ROPS strength. The Honorable John A. Mendez, Senior United States District Judge for the Eastern Division of California, issued a decision in the matter of *Spencer v. Honda Motor Co.,* on October 25, 2022 directly stating that Honda was wrong in claiming, as does Polaris, that it could use gross vehicle weight rather than 110 lbs. x .95 (flywheel horsepower). Attached hereto and incorporated herein by reference as Exhibit B is a true and accurate copy of the decision.

2. In addition to demonstrating Polaris' ROPS does not meet OSHA standards, Plaintiff may offer standards which are measurable and significantly stronger such as requirements for off-road vehicles that enter into amateur races, Federal Motor Vehicle Safety Standard (FMVSS) 216(a) (dealing with roof crush for automobiles and trucks) or standards promulgated by the Insurance Institute for Highway Safety (IIHS) which are even greater than FMVSS 216(a). Plaintiffs' consultants/eventual testifying expert(s) are prepared to discuss the inadequacy of Polaris and the ROHVA's standards and the vast differences between a tractor and an off-road vehicle. In fact, there is almost nothing similar about an agricultural tractor and an off-road vehicle. The voluntary test used by Polaris to assure its customers that the ROPS is safe is not only inadequate, but according to some, deceptively so.

3. Plaintiff can engage an engineer in realistic dynamic testing such as dropping the Ranger onto its top which would simulate a real life rollover and demonstrate the inadequacy of the ROPS. This requires purchasing numerous similar vehicles and transporting them to a laboratory capable of doing drop testing. 30(b)(6) will reveal the extent, or failure, of Polaris to do the same.

4. With considerable effort and expense, and using Polaris' computer aided design (CAD) data and its finite element analysis (FEA) data, Plaintiffs' consultants can model the strength of the existing ROPS. From there, qualified experts can create computer simulations to demonstrate with a high degree of accuracy how much force it took to bend in the A-pillar crushed in on Plaintiff, and the ROPS

in general. Finally, it is believed that knowledgeable engineers can demonstrate that for very little money, Polaris could have significantly strengthened the ROPS by increasing the strength of the steel or employing a slightly different design to the structure. This method is Plaintiffs' preferred method and only recently was discovered. The analysis may cost in excess of $100,000.00, involve a great deal of hours to create appropriate modeling, and is underway.

Plaintiffs' counsel desires to put forth the strongest possible case for his clients. Both option three and four are very expensive. Despite regular communications with knowledgeable consultants, option four only became available at the end of February. The engineers who are suggesting this methodology will testify that it is how most complex products are designed now. Design and implementation happens faster than even. The expense of creating prototype vehicles and smashing them is prohibitive, expensive, lengthy in time, and more difficult to replicate than modeling which can be achieved through computers. Plaintiff deserves the chance to bring before this court and a jury the most compelling evidence possible.

On March 3, 2023, Polaris produced CAD drawings that were immediately transferred to Plaintiffs' experts. (Polaris' response to Plaintiffs' request was swift and no doubt involved many decisions makers and others to implement. Plaintiffs' counsel is grateful. The professionalism exhibited was consistent with the manner in which this case has been litigated and one of the reasons motion practice has been minimal.) FEA files may be forthcoming and lessen the time Plaintiffs' experts need to undertake analysis and ultimately the computer generated creation of a reasonably safe ROPS.

Proceeding with the CAD/FEA analysis will likely blunt many motions in limine and *Daubert* motions saving the court and the parties a great deal of time and expense creating a stronger case now will lessen the work for everyone later. Beyond this case, society may see a real and continuing benefit. As has occurred as a result of product liability litigation, products become

11

safer. Here, injuries and deaths may be prevented once Polaris and other ROV manufacturers understand how to build safer ROPS.

Undertaking the CAD/FEA analysis will require 60 days of intense work by engineers once Polaris produced its FEA and CAD files on March 3, 2023. Plaintiffs' consultants believe they can finish the analysis in 60 days, May 3, 2023.

## CONCLUSION

Wherefore, for all the foregoing reasons, Plaintiff prays that the court adjust the Rule 26 (a)(2)(A) reports of liability experts to May 3, 2023 and the Rule 26(a)(2)(B) reports until May 31, 2023, and allow Polaris a sufficient time to respond with liability expert reports commensurate with this schedule.

Dated: March 6, 2023                                         Respectfully Submitted By:

*/s/ Thomas M. Paris*
Thomas M. Paris
*Counsel for Plaintiff William Ziegler and Vicki Ziegler*

Thomas M. Paris
55 W. Monroe, Suite 3330
Chicago, IL 60603
312-759-1600
tp@tomparislaw.com

12

## PROOF OF SERVICE

   Thomas M. Paris, being first duly sworn, deposes and states that on the 6th day of March 2023, he did cause to be served a copy of the foregoing instrument and this Certificate of Service upon all counsel via email.

                       /s/ *Thomas M. Paris*

**BENESCH, FRIEDLANDER, COPLAN & ARONOFF, LLP**
Dawn M. Beery
Matthew Nirider
Craig L. Sanders
Deana Stein
71 South Wacker Drive, Suite 1600
Chicago, IL 60606
dbeery@beneschlaw.com
mnirider@beneschlaw.com
csanders@beneschlaw.com
dstein@beneschlaw.com


**BARNES & THORNBURG LLP**
Anthony C. Sallah
171 Monroe Avenue N.W., Suite 1000
Grand Rapids, MI 49503-2694
Anthony.Sallah@btlaw.com
*Counsel for Defendant Polaris Industries Inc.*